**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **POPPLE CONSTRUCTION, INC.,** | : | |
| **Plaintiff** | : | |
| **vs.** | : | |
| | : | **No. 06-2C** |
| **THE UNITED STATES,** | : | **(Judge Braden)** |
| **Defendant** | : | |

**PLAINTIFF'S PRELIMINARY WITNESS LIST**

Pursuant to Appendix A ¶ 13(b) of the Rules of the Court of Federal Claims, plaintiff submits the following list of witnesses that plaintiff anticipates it will call or may call during trial. This list does not contain witnesses that plaintiff may choose to call for impeachment. Plaintiff reserves the right to amend this list as allowed in the Court's Rules. Plaintiff also reserves the right to call all witnesses listed upon the witness list of The United States ("US") and to call any witnesses required for the admission of an exhibit into evidence.

1. Mark A. Popple, President
   Popple Construction, Inc.
   202 Main Street
   Laflin, PA 18702
   (570) 823-0531

   Mark Popple will testify as to all relevant aspects of the Levee Raising Project and Popple's damages.

2. Francis Fisher, Senior Project Manager
Popple Construction, Inc.
202 Main Street
Laflin, PA 18702
(570) 823-0531

Mr. Fisher will testify as to all relevant aspects of the Levee Raising Project and Popple's damages.

3. Thomas Nilon, General Superintendent
Popple Construction, Inc.
202 Main Street
Laflin, PA 18702
(570) 823-0531

Mr. Nilon will testify as to all relevant aspects of the Levee Raising Project and Popple's damages.

4. Armand Cencetti, Foreman
Popple Construction, Inc.
202 Main Street
Laflin, PA 18702
(570) 823-0531

Mr. Cencetti will testify as to all relevant aspects of the Levee Raising Project.

5. Joseph Phillips, Estimator
Popple Construction, Inc.
202 Main Street
Laflin, PA 18702
(570) 823-0531

Mr. Phillips will testify as to all relevant aspects of the Levee Raising Project.

6. Kevin Fisher, Foreman
Popple Construction, Inc.
202 Main Street
Laflin, PA 18702
(570) 823-0531

Mr. Fisher will testify as to all relevant aspects of the Levee Raising Project.



2

7. C. Timothy Reilly, Territory manager for Midlantic Machinery
Midlantic Machinery
1261 Highway 315
Wilkes Barre, PA 18702
(570) 824-9891

Mr. Reilly is the former area sales representative for Caterpillar and will testify regarding Caterpillar equipment and availability.

8. Timothy Burns, P.E., President
Midlantic Engineering
3110 Birney Avenue
Scranton, PA 18505
(570) 346-7413

Mr. Burns will testify regarding testing performed and reports prepared.

9. John Vozniak, C.P.A.
Parente & Randolph
46 Public Square, Ste. 400
Wilkes Barre, PA 18701
(570) 820-0151

Mr. Vozniak will testify regarding Popple's overhead, the discussions with Corps representatives regarding Popple's overhead and the agreement reached with the Corps establishing Popple's overhead at 24 %.

10. P.J. Connolly, Former Project Manager for Latona Trucking, Inc.
283 Twin Brook Road
Shickshinny, PA 18655
(570) 368-3574

Mr. Connolly will testify regarding Latona's bid on the Exeter portion of the Levee raising project. Latona's method of constructing the Levee, the productivity of a contractor placing material in 6 rather than 8-inch lifts and the ability to utilize a CAT 815 on the Levee Project.

11. Brad Hontz, Former Estimator/Project Manager
for Latona Trucking, Inc.
848 Woodland Road
Sugar Notch, PA 18706

Mr. Hontz will testify regarding Latona's bid on the Exeter portion



3

of the Levee raising project. Latona's method of constructing the Levee, the productivity of a contractor placing material in 6 rather than 8-inch lifts and the ability to utilize a CAT 815 on the Levee Project.

Respectfully submitted,

BY: ______________________

Raymond P. Wendolowski, Esquire
Counsel for Plaintiff, Popple Construction, Inc.
P.O. Box 1313
Wilkes-Barre, PA 18703-1313
Telephone: 570-270-9180
Facsimile: 570-270-9182

Dated: June 7, 2007



4

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

* * *

POPPLE CONSTRUCTION, INC., Plaintiff : NO. 06-2C

vs. : (Judge Braden)

THE UNITED STATES, Defendant

* * *

Oral deposition of PATRICK CONNOLLY, JR., taken at the U.S. Attorney's Office, William J. Nealon Federal Building, 235 North Washington Avenue, Suite 311, Scranton, Pennsylvania 18501, on Wednesday, July 11, 2007, beginning at 9:03 a.m., before Trisha Sims, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

ACCUSCRIPT, INC.
COURT REPORTERS
218 North Wyoming Street
Hazleton, Pennsylvania 18201-5528
(570) 455-4558 (570) 823-2667 (800) 596-0001

ACCUSCRIPT, INC.

A P P E A R A N C E S:

RAYMOND WENDOLOWSKI, ESQUIRE
LAW OFFICE OF RAYMOND WENDOLOWSKI
P.O. Box 1313
Wilkes-Barre, Pennsylvania 18703
-- Representing the Plaintiff

MICHAEL N. O'CONNELL, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Classification Unit, 8th Floor
Washington, D.C. 20530

-- Representing the Defendant

A L S O P R E S E N T:
Jim Moore
Scott Frick

* * *

* * *

(It is hereby stipulated and agreed by and between counsel for the respective parties that signing, sealing, certification and filing are waived and that all objections, except as to the form of the question, are reserved until the time of trial.)

* * *

PATRICK CONNOLLY, JR.,
Having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MR. O'CONNELL:

Q. Mr. Connolly, good morning. Who is your current employer?

A. Glen O. Hawbaker.

Q. How do you spell that?

A. H-A-W-B-A-K-E-R.

Q. What do you do at that company?

A. I'm an estimator and project manager.

Q. And did you previously work for

Latona Trucking?
A. Yes, I did.
Q. What were the dates of your employment at Latona Trucking?
A. From 1996 through 2004.
Q. And what did you do at Latona Trucking?
A. Project manager and estimator.
Q. And you understand you're here under subpoena in a lawsuit called Popple Construction versus The United States, correct?
A. Yes.
Q. What do you know about the lawsuit Popple Construction versus The United States?
A. The only thing that I do know is that there was a discrepancy on some of the lift thicknesses on the project and the equipment to be used on the compaction.
Q. What do you mean by "a discrepancy"?
A. Popple is contending that the thicknesses that were originally spec'd were eight-inch thicknesses and that they were required to put in six-inch and they brought a claim for additional compensation.
Q. And have you talked to anybody in

the Popple family about the lawsuit?
A. Three weeks ago, Mark Popple and Mr. Wendolowski called me on a conference call. We spoke for just a minute or two and asked if I would be willing to give a deposition. And the this morning, I met with Mr. Wendolowski.
Q. When you talked to Mark Popple and Mr. Wendolowski three weeks ago, had you talked to anybody from Popple Construction prior to that about this case?
A. No.
Q. Do you recall if Latona Trucking bid any of the Wyoming Valley levy projects?
A. We did. We bid three or four of them. The first three or four that were out for bid.
Q. Do you recall which three or four?
A. Well, we were the low bidder on the Exeter and Forty Fort project, which was the first bid. And I know we had bid the two -- we had bid four total. The Kingston section, the Plymouth section and the Wilkes-Barre section.
Q. And for the Kingston project, were you involved in preparing Latona's bid?
A. I was.

Q. And how about for Exeter?
A. Yes.
Q. And do you recall in the Exeter project how many feet of levy construction there was?
A. I don't recall exactly, no. There were two different sections. One in Exeter and one in Forty Fort.
Q. Would 850 feet sound about right?
A. That sounds close for the Exeter portion of the project, yes.
Q. And for the Forty Fort section, was that similar?
A. It was different type of work. It was a dug-toe extension in the river itself. There was no actual levy work on top of the levies for that section, but that section was quite a bit longer than the Exeter section.
Q. What I'm talking about is embankment work actually, expanding the levy by adding fill to it.
A. Forty Fort was a larger portion than Exeter was.
Q. Would you say that that was embankment work, adding fill to it?

A. No. It was a dug-toe excavation, which was adding rip-rap into the river channel.

Q. And how long would you compare the Exeter project to the Kingston project?

A. It was a smaller version of the Kingston project. It wasn't a big long run like you said before. It was about, I would say, between 800 and a thousand feet of levy. Similar work in the types of material used, drainage structures and that kind of thing.

Q. Do you recall how much embankment work there was at the Kingston project?

A. No, I don't.

Q. Besides you, who else worked on Latona's bid for the Exeter project?

A. There was a gentleman there, Brad Hontz, at the time and Joseph Latona would have worked on it also.

Q. All right. And can you describe the process by which you folks would have prepared the bid for, say, the Exeter project?

A. Well, like any bid, the documents, if they have an item breakdown, you know, you take one item at a time, verify that the plans are correct, put together activities with crews

and materials and production rates.
Q. Do you do a site visit?
A. Absolutely, yes.
Q. Do you recall what equipment Kingston -- I'm sorry -- Latona planned to use to compact the fill on the Kingston project?
A. We would have planned on using a vibratory sheepsfoot roller like we did on the Exeter project.
Q. Do you recall what type of equipment specifically Latona used on the Exeter project?
A. Yes. It was an Ingersol Rand sheepsfoot roller. I'm not sure of the model number. I'm thinking SP54.
Q. And do you recall what lift thicknesses Latona constructed the Exeter lifts in?
A. I don't recall the lift thicknesses.
Q. Do you recall what the contract requirements were for the Exeter project with respect to lift thicknesses in terms of maximum sizes?
A. I don't recall specifics on it.
Q. And do you recall in the Exeter project if there were any specific requirements

with respect to the types of equipment that could be used to compact the fill?

A. As far as I can remember, there was a sheepsfoot roller requirement and a density requirement. There was no specific model or brand of equipment spec'd that I can remember.

Q. Right. And in preparing Latona's bids for, say, the Exeter and Kingston projects, did you prepare any kind of worksheets in calculating the bid?

A. Latona had an estimating program at the time. So we would use that. It's -- HCSS is the program.

Q. And would you do take-offs of the work to be performed?

A. Yes.

Q. And would you make determinations with respect to crew sizes?

A. Yes.

Q. And would you calculate, you know, what kind of equipment and how many pieces?

A. Yes. It's typically putting together an activity such as placing fill, coming up with a crew and assigning a production rig to it.



00000000-0000-0000-0000-000000000000

Q. Would you calculate what your daily production -- you would expect it to be?
A. Yes.
Q. Would you determine what materials would be incorporated into the work?
A. Yes.
Q. Now, have you talked to anybody about the document request that was attached to the subpoena?
Did you see in the subpoena that we had requested all documents which evidence Latona's plan and actual methods of constructing the Exeter portion of the Wyoming Valley levy raising project?
A. I did. And I contacted Mr. Wendolowski and told him that I had no access to those files now. I'm no longer with them.
Q. Did you review any documents in preparation for this deposition?
A. No, I didn't.
Q. Do you recall when Latona did the work on the Exeter project?
A. It was throughout the year 1997.
Q. Do you recall if there were --

whether both random and impervious fill was used on the Exeter project?

A. I'm certain impervious was used. I'm rather certain that some random fill was used also, but not -- but I'm not sure.

Q. Do you recall what piece of equipment Latona would have used to compact the random fill?

A. It would have been a sheepsfoot roller, an Ingersol Rand sheepsfoot roller, and we also had a smooth drum roller there to seal the lifts up at night in case it got rain.

Q. For the Exeter project, were there any departures in terms of equipment used versus the equipment that Latona had planned to use at bid?

A. No.

Q. Do you recall if there were any differences in specifications with respect to compaction for the Kingston and Exeter projects?

A. I don't recall.

Q. Let me show you the specifications for the Exeter project -- I'm sorry -- for the Kingston project. This is the embankment section of the contract.



00000000-0000-0000-0000-000000000000

Take a look at the paragraphs that follow 10.1, compaction equipment.

* * *

(Pause)

* * *

Q. All right. Are you finished?

A. Yes.

Q. Now, with respect to this provision you just read in 10.1.3 for a tamping roller, do you recall if there was a similar requirement, now having read this, in the Exeter project?

A. I believe there was.

Q. All right. There's a requirement here that the length of each tamping foot from the outside surface of the drum should be of sufficient length to penetrate at least 75 percent of the uncompacted lift thickness.

Do you recall if there was something similar to that in the Exeter project?

A. I don't specifically recall.

Q. Do you know if there's equipment manufactured that would penetrate 75 percent of the depth of an eight-inch lift?

A. I'm not sure of the specific model right now, but I would assume there would be.

Q. Did you ever go to the site of the Kingston project while Popple was performing its work on that project?
A. No.
Q. Do you know anything about how Popple intended to do the work on that project?
A. No.
Q. Do you know anything about how they actually did the compaction work on the project?
A. No.
Q. Are you familiar with the Caterpillar 815 compactor?
A. Yes.
Q. And what's the extent of your familiarity with that piece of equipment?
A. I've never -- with the company I'm presently with, we do use -- not only 815s, but 825s, which is a little bit larger model, for fill placement.
Q. Okay. And does your company own an 815?
A. I believe we own several of them.
Q. Have you had any experience in attempting to obtain an 815?
A. No.

Q. Have you been the project manager on projects where an 815 was used?
A. No.
Q. Do you know what an 815 is used for?
A. It's for spreading and compacting fills.
Q. You mentioned a minute ago that the 825 is larger than the 815. Do you know how much larger the 825 is versus the 815?
A. Not exactly, no. I don't know weights or dimensions, that I can recall, on either one.
Q. What can you tell me about Latona's method of constructing the Exeter levy?
A. In regards to?
Q. I don't know. Take a look at a description of your testimony here on Popple's witness list.

* * *

(Pause)

* * *

Q. So I assume you just read that the description of your testimony states that part of your testimony will include Latona's method of constructing the levy, presumably for the

Exeter portion of the project. What can you tell me about that?
A. I can't remember all of the specifics of the placement, other than the material was placed in lifts and compacted.
I can't remember thicknesses of lifts, if that's what you're asking me. I would assume the thickness of the lift was in order to get the proper compaction, the density compactions.
Q. For the embankment work that was done on the Exeter project, do you know how high the original levy was?
A. The elevation?
Q. Yes.
A. I don't recall the elevation.
Q. Well, I don't mean elevation in terms of like mean sea level. How far did the levy rise?
A. In Exeter, I'm going to say it was less than five feet.
Q. And then how many feet were added to it?
A. Less than five feet. We added less than five feet to the existing levy.

Q. So from, like, say the ground at the base of the levy to the top of the existing levy --
A. I would say 20 feet --
Q. Twenty feet?
A. -- the original levy was.
Q. And do you recall what was the width at the toe of the levy?
A. At the toe?
Q. Yes.
A. I don't, but I would assume it was 50 feet.
Q. And do you recall how much right-of-way was available for use in the Exeter project?
A. I don't.
Q. Do you know how much on the Kingston project?
A. No, I don't.
Q. Do you know the answer to that question for any of the other Wyoming Valley projects that you bid on?
A. No.
Q. While you worked with Latona, did Latona ever use an 815 on any projects?

A. No.
Q. What about an 825?
A. No.
Q. Do you recall if Latona ever attempted to obtain an 815 or 825 for a project?
A. I remember it was discussed on several projects, maybe not the levy, to look into obtaining one. But we never did -- we never did follow through and get one.
Q. Are you an engineer by training?
A. No.
Q. And what's your educational background?
A. Just a high school diploma.
Q. Do you have experience in compacting soils on projects?
A. Yes.
Q. What would you say are the various factors that affect the ability to compact a soil?
A. The factors are the material's moisture content, the composition of the material, the equipment used.
Q. Now, would it be correct to say that a material can be either too wet or too dry to



00000000-0000-0000-0000-000000000000

achieve proper compaction?
A. Yes.
Q. What do you do if a material is too wet or too dry?
A. It needs to be aerated by disking or just allowing it to set out in the sun or wind and dry it to the proper optimum moisture to get it compacted.
Q. I would take it that's your answer to what do you do if it's too wet. What do you do if it's too dry?
A. If it's too dry, you have to add moisture to it.
Q. Are you familiar with the term compactive effort?
A. Yes.
Q. What do you understand that term to mean?
A. It would mean to me putting all resources necessary to get something compacted based on the materials. Putting forth a good effort to compact the material that you're working with, without any extraordinary means of getting it compacted.
Q. Would you agree with the statement

that it generally takes more energy to compact a larger quantity of material than a lesser quantity of material?
A. Volume or thickness?
Q. Let's start with thickness.
A. It takes -- soils are different. It depends on what kind of soil. Sometimes, generally speaking, a thinner lift is easier to compact than a thicker lift.
Q. Would you agree that the compactive effort would be dependent on a number of factors such as soil type?
A. Yes.
Q. And moisture content?
A. Yes.
Q. The desired compaction percentage?
A. Yes.
Q. The weight of the compaction machine?
A. Yes.
Q. And would you agree with me that the number of passes that would be needed to compact a given material is something that could only be determined by testing the material and the equipment on the job?

A. Typically for testing, there's a proctor [ph] that's obtained with the material. I'm not sure of the engineering part of it. But in-place density tests are then taken, and you can get a roller pattern or establish a roller pattern from there.

If it's taking four passes to get it to the right density or 10 passes, that's pretty much determined in the field. There's nothing in a book to tell you how many.

Q. Do projects such as the Exeter or the Kingston projects typically require test strips?

A. I recall that the Army Corps required test strips.

Q. All right. When you're preparing a bid for the Kingston or the Exeter project, how important to you, as an estimator, is the lift thickness -- the maximum lift thickness required by the contract?

A. It's one of the big variables to this day in estimating, especially when the access is in a wide open field or something like that. If there's limited access, it's very important on how much material you can deposit

on your way out to a lift.

Q. And what factors go into deciding what lift thickness you're actually going to use in your bid?

A. Through the specifications.

Q. So if the specifications says eight, you would just simply prepare a bid based upon eight-inch lifts?

A. Yes.

Q. Would you ever -- is it possible that you'd ever go and say, "Well, this specification allows us to do up to eight-inch lifts; but, for whatever reason, we think it might be more advantageous to do thinner lifts"?

A. Typically, if it allowed eight-inch lifts, we figure that we can bid it according to an eight-inch lift. The compaction portion of the operation, which is just one piece of equipment -- the problem is access back into the lift. So we figure -- even if it takes more passes to get it compacted, it's more important to look at how much material we can deposit in a time frame.

Q. So if you're dealing with a contract that said lifts are to be placed and spread in

layers not more than eight inches in uncompacted thickness, if you're dealing with that sentence, can you give me an idea as to how you would prepare the bid?

A. Again, the bid is put together. And the way I do it is by an activity, such as spreading the impervious fill, a crew is assembled, what it would take, crew and manpower, materials. And then a production rate is assigned to it.

Q. What kind of -- would you make any effort to make sure you had equipment to do an eight-inch lift prior to placing your bid?

A. You put the proper equipment in with the activity, yes.

Q. What would you do to make sure you actually had the equipment or could get it?

A. I would make sure -- one thing we do is we look if we own the piece. If it was something special that was needed, a certain brand or type, we would make sure that we could get one, because we would need a rental price or something to that effect before the bid.

Q. Do you have any idea how difficult it is to rent an 815?





00000000-0000-0000-0000-000000000000

A. No, I don't.

Q. Going back to the witness list that I had you read a few minutes ago, it also states that you're going to testify concerning the productivity of a contractor placing material in six, rather than eight, inch lifts and the ability to utilize a CAT 815 on the levy project.

What can you tell me first about the productivity of a contractor placing material in six, rather than eight, inch lifts?

A. Again, with a limited access area, the productivity -- you'd look at the area that you were going to fill and figure how much per day you could get into the area.

Obviously you can get more material in an eight-inch than a six, and that would adjust your price considerably.

Q. Were the Kingston -- let me start with the Kingston. Was Kingston what you would call a limited access project?

A. Yes.

Q. What about Exeter?

A. Yes.

Q. So how would you adjust your price

for the six versus the eight-inch lift?

A. Well, if I knew that -- the nature of the impervious was that there was always a concern with the moisture on it.

Before you could back up and place another lift, that lift would have to be properly dried and compacted.

So it would affect how many cubic yards a day you could put in with the same crew.

Q. But could you tell me how many -- what the difference in the cubic yards would be?

A. Probably 25 percent less on a six-inch lift than an eight-inch.

Q. And what can you tell me about the ability to utilize a CAT 815 on the levy project?

A. From what I recall, especially in Exeter, that a CAT 815 -- there's a picture here (indicating). There's a gap between the wheels on it. As you got up on the levy on the top, it would be very hard to make one useful because you'd be missing a spot.

The tops of the levies were, from what I recall, 10 feet. So it wouldn't be my first choice as compaction equipment.

Q. Okay. And you're pointing to Exhibit 22. And do you think that the picture in Exhibit 22 shows an 815?
A. I would -- it's an 815 or 825.
Q. And you said at the top for the Exeter project, it would be difficult to use the 815?
A. Yes. I think the machine itself is about 10 to 12 feet wide, and the tops of the levies, from what I remember, are about 10 feet wide in Exeter.
Q. How about down towards the base of the levy in Exeter, any reason you couldn't use an 815 there?
A. We didn't have that situation, from what I recall, at Exeter. It was -- it wasn't a total reconstruction down to the toe. There was some excavated out, and then brought back up.
Q. So if you were constructing a levy and the lift was more than 12 or 14 feet wide, can you think of any reason why you couldn't use an 815?
A. No.
MR. O'CONNELL: All right. Let's take a break. I think I'm just about done.

* * *

(Whereupon, a brief recess was taken from 9:35 a.m. until 9:38 a.m.)

* * *

BY MR. O'CONNELL:

Q. Just a couple of more questions, Mr. Connolly. I think you may have already testified about this. Just to make sure we're clear, for the Exeter project, Latona Trucking, for the impervious fill, used an Ingersol Rand piece of equipment, correct?

A. Yes, to the best of my recollection.

Q. And do you or don't you recall the model number for that?

A. I'm going to say it was an SP54.

Q. SP54. Do you know what the length of the tamping foot on that piece of equipment is?

A. I don't.

Q. And for the random, I believe you referenced a smooth drum roller; is that correct?

A. We had a smooth drum roller on site just to straighten things up at the end of the day. Because a sheepsfoot leaves like pock

marks in it. And if it rained, they'd fill with water.

Q. What did you use to compact the random?

A. I can't recall at the time. I'm sure it may have been the sheepsfoot and -- a combination of the sheepsfoot and the smooth drum. But I can't recall.

The only reason I say an SP54 is because Latona had several of them, and I don't remember a lot of other kinds of machines that they -- you know, they didn't have Caterpillar rollers or anything like that. That's why I'm referencing that model.

MR. O'CONNELL: All right. I have no further questions.

* * *

EXAMINATION

* * *

BY MR. WENDOLOWSKI:

Q. I have just a few follow-up questions.

Mr. Connolly, you had said before -- your testimony was that you assumed there would be equipment to achieve 75 percent compaction on

the penetration of an eight-inch as you had read in the specifications that Mr. O'Connell had showed you.

Why is it that you assumed that there would be?

A. Just the fact that if it was in the spec books, they must have researched it enough to know that there was something out there for what they were spec'ing.

Q. As an estimator, is it your role to go back and check what's in the spec to make sure that what the engineer placed in the spec was actually achievable, or is that something you rely on?

A. Both. If it seems too far out of whack, sometimes you can ask a question prebid. But for the most part, you adhere to their specs and base your bid on that.

Q. Okay. And you are familiar from the fact that you estimated the Kingston project with the length of the runs on the project?

A. Yes.

Q. And were they substantially larger than the Exeter work that Latona did?

A. Absolutely, yes.

Q. Okay. Can you explain to me, as easily as you can in laymen's terms, in estimating the Kingston portion of the project how it would be more costly to place that material in six-inch lifts versus eight-inch lifts?

A. You have a daily crew which consists of equipment and men and materials, and that's all factored in with a production rate. So if you had a thousand foot stretch of levy to do, to bring lifts up, it was -- you'd have to look at it to say, okay, in one day, since each truck -- from what I remember on the Kingston portion, as you were constructing impervious on the levy, it was one truck in and one truck out.

There was no room to pass trucks. So obviously backing up and being able to put in eight inches of material to complete a lift, you'd get more done in a day. So it would affect your unit cost.

Q. Is that true even though it would take more compaction effort to compact the eight-inch versus the six-inch?

A. Is it more true? I'm sorry.

Q. Is that true even if compacting the

eight-inch lift required more compaction effort than it would for a six-inch lift?

A. The compaction effort is behind the operation, the dumping operation. So on a run that long, it would seem like there would be more than enough to time to compact behind the operation.

It's how fast you can place the material. More material a day divided by the cubic yards -- or I'm sorry -- the cubic yards divided by the crew cost, it's significantly different.

Every one of our activities is based on how much can you get in in an eight-hour day with that specific crew.

Q. So how much more can you get in an eight-inch lift versus a six-inch?

A. Well, again, in a limited area -- now, if it was a great big wide open field, it wouldn't have an impact on it, because you can move from one side to the other side.

In a limited area, I think it would be -- six to eight must be 25 percent less quantity in the same time frame. I mean, if it takes a truck X amount of time to back up and

you can lay it out in an eight-inch lift, it would certainly be more productive than a six-inch lift.

Q. And Mr. O'Connell asked you about the ability to use the 815 or the 825 on the Kingston portion of the levy.

Let me follow up on that briefly. Is there a lot of area for this machine to maneuver on these long runs? Is there a problem with the turning radius?

A. Yes, especially when you get up to the width of the machine. I mean, it's very hard to turn the machine enough to compact in between the wheels.

Looking at something like an Ingersol, it has just one drum in the front that covers. You can move over to the edge. It's probably a better choice --

Q. I think you had --

A. -- on a levy.

Q. I think you had said before that the 815 wouldn't be your first choice for doing this type of work; is that correct?

A. Not from what -- no, it wouldn't be, not from what I remember of the Kingston

portion. Exeter it was certainly out of the question to use an 815. There was -- Exeter was very compact and limited.

MR. WENDOLOWSKI: That's all I have. Thanks.

MR. O'CONNELL: Nothing else.

* * *

(Witness excused.)

* * *

(Whereupon, the deposition was concluded at 9:44 a.m.)

* * *

# I N D E X

* * *

WITNESS: Patrick Connolly, Jr.


| QUESTIONED BY: | PAGE |
|---|---|
| Mr. O'Connell | 3 |
| Mr. Wendolowski | 27 |


# E X H I B I T S

* * *

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| (None marked.) | | |

* * *



00000000-0000-0000-0000-000000000000

C E R T I F I C A T E

I, Trisha Sims, CCR, Certified Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further, that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Trisha Sims
Court Reporter
Notary Public