IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

* * *

| | | |
|---|---|---|
| POPPLE CONSTRUCTION, INC., | : | |
| Plaintiff | : | |
| | : | NO. 06-2C |
| vs. | : | |
| | : | (Judge Braden |
| THE UNITED STATES, | : | |
| Defendant | : | |

* * *

Oral deposition of BRADLEY HONTZ, taken at the U.S. Attorney's Office, William J. Nealon Federal Building, 235 North Washington Avenue, Suite 311, Scranton, Pennsylvania 18501, on Tuesday, July 10, 2007, beginning at 9:53 a.m., before Trisha Sims, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

ACCUSCRIPT, INC.
COURT REPORTERS
218 North Wyoming Street
Hazleton, Pennsylvania 18201-5528
(570) 455-4558 (570) 823-2667 (800) 596-0001

ACCUSCRIPT, INC.

A P P E A R A N C E S:

RAYMOND WENDOLOWSKI, ESQUIRE
LAW OFFICE OF RAYMOND WENDOLOWSKI
P.O. Box 1313
Wilkes-Barre, Pennsylvania 18703
-- Representing the Plaintiff

MICHAEL N. O'CONNELL, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Classification Unit, 8th Floor
Washington, D.C. 20530

-- Representing the Defendant

A L S O P R E S E N T:
Jim Moore

* * *



ACCUSCRIPT, INC.

* * *

(It is hereby stipulated and agreed by and between counsel for the respective parties that signing, sealing, certification and filing are waived and that all objections, except as to the form of the question, are reserved until the time of trial.)

* * *

BRADLEY HONTZ,

Having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MR. O'CONNELL:

Q. Mr. Hontz, what is your current profession?

A. I'm chief estimator for Latona Trucking.

Q. All right. I received a witness list from Popple that says "Brad Hontz, former estimator/project manager for Latona Trucking."

A. I worked there when I got out of college. Then I went to work for another

company, and then I came back recently about three years ago.

Q. Can you give me the dates as to the two periods of your employment with Latona?

A. It would have been from '94 -- 1994 to 19 -- I would say -- I think it's '98 or '97 and then recently would be from 2004 to 2007.

Q. You're here because of a subpoena?

A. Correct. Yes.

Q. And we had asked you to provide evidence with respect to -- or documents with respect to Latona's bid on the Exeter portion of the Wyoming Valley project.

A. Correct.

Q. And you didn't bring any records last week with respect to that?

A. No. We don't have any left. It's been too long of a period. We don't have any records pertaining to that project left in our office.

Q. Are they in storage?

A. No. I think after five years or whatever the -- whatever the time period is between projects that they're allowed to get rid of them, throw them out. I'm not sure.

Q. Who did you talk to at Latona Trucking about obtaining those records?

A. That would have been Laurie Schwab, which is our sort of office manager, I guess.

Q. Did she tell you that they had been destroyed?

A. Yes.

Q. What was the time period of the performance of the Exeter project?

A. I believe it was -- don't quote me on this -- '95, '96. I can't remember what year it was.

Q. Did you prepare Latona's bid for that project?

A. I was one of the parties that was involved in that, correct.

Q. Who else prepared that?

A. It would have been Joseph Latona, which is the owner of the company, and I believe at the time P.J. Connolly was involved in that as well.

Q. You know, at least from the subpoena, that you're here because of a lawsuit entitled Popple Construction versus The United States?

A. Yes.
Q. Do you know what the subject matter of that lawsuit is?
A. Briefly what I know of it is just the placement of fill on a levy that's in question based on eight-inch lifts or six-inch lifts.
Q. All right. Have you talked to anybody at Popple Construction about the lawsuit?
A. Just briefly.
Q. Who did you talk to?
A. It would have been Mark Popple.
Q. When did you talk to Mark Popple about it?
A. Actually today.
Q. All right. Did you talk to him before today?
A. Yes. He had called me on the phone and asked me, you know, if he would subpoena, would we testify. And I told him yes.
Q. Testify about what? Did you discuss that?
A. Just exactly what I told you, between the six-inch lift and eight-inch lift,

cost-wise.

Q. All right. What did you and Mark Popple talk about today?

A. The same thing, just -- you know, the first time he talked to me, it was just briefly. He asked, "Would you testify based on what our lawsuit is about?" I said yes.

Today was just a briefing on the cost between a six-inch lift and an eight-inch lift, placing it on the levy.

Q. What did he tell you about the difference between a six-inch and an eight-inch lift?

A. He just described what the -- you know, that there is a cost difference between the two areas of work which there is -- it is more expensive to put a six-inch lift on than it would be an eight-inch lift on a levy project, or pretty much any earthwork project.

Q. Did he quantify that cost difference?

A. No.

Q. Have you calculated the cost difference of a six-inch versus an eight-inch lift?

A. No, I did not.

Q. What can you remember about Latona's bid for the Exeter project?

A. I can tell you it was -- pertained to basically two different areas, which would be in Exeter and Kingston. The bid, I think, was somewhere around -- a little over $2 million, between two and $3 million.

And what I remember from it -- let's see what was I going to say? Oh, we were not the successful low bidder on the project.

I believe Lindy Enterprises [ph] was the low bidder, but their bid was thrown out due to them using the wrong bid form on the project.

Q. And then Latona was then awarded?

A. Then subsequently awarded the project based on the low bidder not pertaining to the rules of bidding work.

Q. Do you recall how much embankment work there was in that project?

A. I don't offhand, no.

Q. Can you think of it in terms of, say, the Exeter project versus the -- well, let me take a step back.

Are you familiar with the

Kingston-Edwardsville project?

A. Popple's project?

Q. Yes.

A. Not really the items of work. I'm not familiar with it. As far as how much -- you know, quantity-wise, how much there was, how much their bid was, I have no idea.

Q. We took -- Mr. Moore and I took a quick look at the drawings for the Exeter project yesterday; and just from our quick review, it looked like there was about 850 feet of levy work on that project. Does that offend your memory?

A. Yes. I think cost-wise, it might have been maybe half the work or maybe a little more than the total bid from what was separated between the Kingston side and the Exeter side.

Q. I think I just asked you the question poorly because I said, "Does it offend your memory?" And you said yes. But I think from the tone of your voice, you were testifying that 850 feet is consistent with your memory?

A. Correct. Sorry.

Q. Do you know what equipment Latona planned on using to compact the fill on the

Exeter project?

A. I know we did have sheepsfoot rollers there, a regular roller. I couldn't tell you exactly what numbers or what makes or models, but that would have been our typical equipment that we use for compaction.

Q. Okay. What kind of sheepsfoot equipment?

A. I believe we did have a CAT, an 815 there. And we also had -- I believe the other one was an Ingersoll Rand, which would have been the smooth drum roller.

Q. Did you guys own a CAT 815?

A. No.

Q. So when you say you had it, where did you have it? You had it in the bid?

A. Yeah. We would have rented it probably from, you know, Cleveland Brothers since they're the only CAT dealer around.

Q. Do you know how hard it is to obtain an 815 typically?

A. We don't use it all the time on pretty much any of the projects we use, but it is a harder machine to find --

Q. Okay.

A. -- from what I can recollect.
Q. Okay. What projects did Latona use it on?
A. From my memory, that probably would have been the only project that we've used it on.
Q. Okay. So you think that Latona did use an 815 on the Exeter project?
A. From what I can recall, I would say yes, we did.
Q. Do you know if Latona bid the Kingston-Edwardsville project?
A. I don't know.
Q. Who at Latona would know that?
A. Well, Joseph Latona would know that. He was -- he's the owner.
Q. Do you know, with respect to the Exeter project, if there were any changes in the equipment that Latona used on the project versus what it based its bid on?
A. I can't recall that. It's hard to say. I mean, you know, we bid jobs. And sometimes you use stuff that you think you're going to use, and sometimes you use something else. I couldn't recall that.

Q. Sure. Do you recall reviewing the specifications for any of the other Wyoming Valley levy projects?

A. No. That would be the only one that I was involved with.

MR. O'CONNELL: Let me just -- let's go off the record for a second.

* * *

(Whereupon, a discussion was held off the record.)

* * *

BY MR. O'CONNELL:

Q. Mr. Hontz, let me show you what's -- it's actually a section of the Kingston project. It's the embankment section of the contract. Let me ask you to take a look -- you can take a look at it, but then I'm going to specifically ask you about page nine. I'm not going to mark it as an exhibit yet.

A. Do you want me to look at the whole thing?

Q. You can look at it if you'd like, but my questions are going to be directed to paragraph 10.1 on page nine.

A. Okay.

* * *

(Pause)

* * *

A. 10.1?

Q. Just 10.1.1 for starters. Now, from reading that specification, do you understand what kind of equipment was to be used for compaction of the impervious fill?

A. Yes.

Q. What?

A. By the spec there, it says a sheepsfoot roller.

Q. And there's some particular penetration requirements there. You might have to go down to one of the next paragraphs.

* * *

(Pause)

* * *

A. Okay.

Q. So what is the penetration requirement?

A. It states that -- penetrate at least 75 percent of the uncompacted lift thickness, but not more than 110 percent.

Q. Let's talk about the Exeter project

for a second. Do you recall if there was any particular thickness of the lifts that the contract allowed?

A. Without reviewing those documents, I can't tell you truthfully.

Q. All right. And do you recall if there was anything similar in the Exeter project to that 75 to 110 percent compaction requirement that you're reading in the Kingston contract?

A. Again, without reviewing the documents, I couldn't say "yes" or "no."

Q. All right. You can put that in the pile there. Did you ever go to the Kingston project while Popple was performing its work?

A. No.

Q. How familiar are you with the Caterpillar 815?

A. I'm familiar with the machine. I mean, I couldn't tell you its operating capacity, all that kind of stuff, but I know what the machine looks like and what it does.

Q. What does it do?

A. It's a sheepsfoot roller that compacts your fill.

Q. All right. Do you know what the

difference between a Caterpillar 815 and
Caterpillar 825 is?
A. The 825 is probably a bigger machine. That's all I can tell you about that.
Q. What can you -- we might have touched on this. But what can you tell me about Latona's method of constructing the Exeter levy?
A. From what I recall, it would have been -- there was an existing levy there. So we were contracted to raise that levy.
So it would have been the use of the same types of materials as far as the breaker rock, the impervious material, topsoil, all in specific layers at certain depths.
Q. Well, we just a moment ago talked about eight-inch lifts. Do you recall what the thickness of the lifts that Latona constructed to the Exeter project were?
A. As far as I recall, I believe it was eight-inch lifts.
Q. Is that what -- is that the way that Latona bid it, to do eight-inch lifts?
A. Correct.
Q. And can I infer from your answer that if there were any requirements in the

contract with respect to the types of equipment needed to do eight-inch lifts that Latona was successful in obtaining such equipment?

A. I would say yes.

Q. Are you familiar with whether there are various factors that can affect the compaction of soil?

A. Yes.

Q. Okay. And is one of those things that would affect compaction of soil the material gradation?

A. Yes.

Q. How does it affect the compaction?

A. A larger graded material would not compact as well as, say, a mixture of various sized material, especially with fines in it, smaller fines, like a sand or something like that. That would compact -- the cohesion of those two soils would cause them to compact better than, say, if it was all round stone, for example.

Q. What about moisture content? Does. That affect soil compaction?

A. Yes.

Q. How so?

A. The wetter the material, the more it will compact. But if it's too wet, it's not going to be suitable. Wetter material usually needs to dry to a certain point before it can be compacted to its maximum dry density or its compaction factor.
Q. So what I take from that answer is that it's possible that a contractor might have to dry soil if it's too wet or add water if it's too dry?
A. Correct.
Q. Are you familiar with the term "compactive effort"?
A. No. I could infer what it means.
Q. I'm talking about the energy to achieve compaction of soil.
A. Okay.
Q. Is that what you were thinking of?
A. Compactive effort would have meant to me your attempts to compact the material.
Q. Would you agree with me in general that it takes more effort to compact a larger quantity of material than a smaller quantity of material?
A. How so? Do you mean by just like

quantity of material, say, 10,000 yards compared to a thousand yards?

Q. Say you were going to do like an eight-inch lift versus a four-inch lift, would you expect it would take more compactive effort to compact an eight-inch lift than a four-inch lift?

A. It all depends on the material. That's what I would say.

Q. What if you're using clay material -- let me just rephrase that. What if you're using fine-grained soils?

A. I would say it probably takes more of an effort to do an eight-inch lift based on -- you probably have to do it -- you know, more passes to be able to get the compaction of the material based on a four-inch lift.

But, again, it depends on the material. Some materials compact just as well with a four-inch lift as it does with an eight-inch lift.

Q. Would you agree that actually the number of passes for a given compaction is dependent on various things, such as the soil type, the moisture content, the desired

compaction and the weight of the compaction machine?

A. Yes.

Q. That was sort of a compound question. Let me break it down for you.

Is it dependent on soil type?

A. Yes.

Q. The moisture content?

A. Yes.

Q. The desired compaction?

A. Yes.

Q. And the weight of the compaction machine?

A. Yes.

Q. And would you agree that the number of passes needed to compact a given material with a given piece of equipment could only be determined by testing the material and the equipment on the job?

A. Yes.

Q. And to your knowledge, do these levy construction projects typically have a test strip requirement in the contract?

A. I believe so, yes.

Q. What's the purpose of the test strip

requirement?

A. To me, it would be to test the material as it is in place or as you're hauling it in, wherever you're getting the material from, to determine how many passes you need with a roller, with the type of compaction equipment that you're using, and how it responds, based on the conditions of -- in the field.

Q. All right. And when you're preparing a bid for one of these levy projects, how does the maximum lift thickness provision in the contract affect your calculation of the bid price?

A. What we do, we would figure -- you know, we would look through the specs. And whatever the maximum lift capacity would be, that is what we would probably use for our preparation of our bid.

Q. But the question though is: How does it affect the price? Can you tell me how an eight-inch lift price would vary from a two-inch lift or a four-inch lift?

A. Well, the time it would take to construct that in an eight-inch lift would be a lot less than it would be if you have to use a

two-inch lift.
Q. Okay. How would we go about calculating the price difference, though, in a competitive bid situation?
A. I would say you would have to determine a specific amount of material, say, 10,000 yards, whatever it is. Estimate it based on using an eight-inch lift and a two-inch lift and calculate the time it would take you to do that so you would calculate your equipment time and labor time for each variable lift.
Q. Would you have to factor in the fact that there might be fewer passes for the thinner lift?
A. Yeah. You would have to factor that in.
Q. All right. Other than a contract provision that says, say, a maximum of eight-inch lifts, what other factors does a contractor use to determine how thick the lifts that he's going to construct are going to be?
A. Without a written spec, we would probably go to maybe the geotechnical report on the site, based on the material. Whether it's solid rock there or not solid rock, if it has to

be drilled and shot, that would all come into play.

Usually the geotechnical report is the one that tells you what the geotechnical engineer recommends you use as lifts -- lift thicknesses on a project.

Q. If the contract said a maximum of eight-inch lifts, would you automatically build eight-inch lifts, or is it possible that there's other factors that might cause the contractor to build the lifts in thinner layers than eight inches?

A. I'm sure there's -- if conditions in the field warranted something other than an eight-inch lift, we would have to revise our methods of constructing it.

MR. O'CONNELL: All right. Let's take a break. I think I'm almost done.

* * *

(Whereupon, a brief recess was taken from 10:19 a.m. until 10:21 a.m.)

* * *

BY MR. O'CONNELL:

Q. Back on the record. I just have a couple of questions.

Let me just read to you from Popple's witness list concerning your testimony. It says that one of the things you're going to testify to is, quote, the productivity of a contractor placing material in six rather than eight-inch lifts.

What can you tell us -- other than your earlier testimony that you think it's probably more expensive, what exactly can you tell us about the productivity difference?

A. Let's see. Productivity in a six-inch lift compared to an eight-inch lift would be the time, the equipment costs, the labor costs.

Using an eight-inch lift, you know -- say you have three lifts of eight-inches, and you have to go up two feet. The equipment time and the labor time to do that in an eight-inch lift would be a lot less, I would say, than a six-inch lift because you'd have four lifts of six to get three lifts of eight.

Q. And how would you factor in the affect on productivity of fewer passes?

A. Well, the problem is -- to me, even

if you are doing fewer passes, we would still have a testing company, whether it would be employed by us or the owner, depending on the project. They would still have to test that lift and that does take time.

But every lift would have to be tested at that point, whether you're doing a six-inch or an eight-inch.

Q. Are you an engineer?

A. I have a bachelor's of science in civil engineering.

Q. Okay. Do you generally consider yourself an expert as to the productivity of lift thicknesses and so forth?

A. I wouldn't consider myself an expert.

Q. All right.

A. Just experience.

MR. O'CONNELL: All right. I don't have any further questions.

* * *

EXAMINATION

* * *

BY MR. WENDOLOWSKI:

Q. Briefly describe for us what your

experience has been in the earthmoving industry so when we come to the idea of what your experience is, we have an idea of what it is.

A. As far as earthmoving, I've been involved in earthmoving projects from college all the way to my career here.

I worked for PennDOT in the summers when I was going to college. I worked on various projects for them. When I got out of college, I worked for Latona.

I've done countless projects as far as earthwork. Then I worked for Haines & Kibblehouse, the same thing, with many projects involving earth, drilling, shooting solid rock, all types of material, clay, sandy soil, silty soil.

I couldn't tell you how many projects we've done. Virtually every project we do has some earthwork involved, whether it's large scale or small scale.

Q. As an estimator, when you're looking at a project specification, like the one that Mr. O'Connell showed you that said you could place lifts in up to eight-inch -- in thicknesses of up to eight-inch lifts, you

already testified that as an estimator you would bid the project based on using eight-inch lifts; is that correct?

A. Yes.

Q. When you see the specification that he also referred you to about the compaction percentage of 75 to 110 percent, as an estimator, when you see that in a specification, do you actually do the math and check it and see if there's equipment that will meet that specification, or are you assuming that if it's specified, that there's something out there that could do that?

A. Usually we don't have enough time as estimators to go into that detail when you're preparing an estimate.

Most of the time, we have maybe two weeks to do a project. So all we have time for is -- you know, what I do is I go through the spec, make my notes based on what is in there and what's important to the part of the project that you're bidding on the project and go from there.

We never have the time to figure on specific equipment to do specific tasks. When

we put a bid together, it's either a large excavator, a medium excavator. We don't go into numbers, sizes and that kind of stuff.

The same thing with trucks, loaders, you just don't have that time. We take as much as we can and put a number on the equipment that we think we're going to use and what's going to be -- what we think is going to be available.

Sometimes we use our own stuff. Sometimes we have to rent, based on the availability of our own equipment.

MR. WENDOLOWSKI: Okay. That's all I have.

MR. O'CONNELL: That's it.

* * *

(Witness excused.)

* * *

(Whereupon, the deposition was concluded at 10:26 a.m.)

* * *

# I N D E X

* * *

WITNESS: Bradley Hontz

| QUESTIONED BY: | PAGE |
|---|---|
| Mr. O'Connell | 3 |
| Mr. Wendolowski | 24 |

# E X H I B I T S

* * *

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|

(None marked.)

* * *

C E R T I F I C A T E

I, Trisha Sims, CCR, Certified Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further, that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

________________________

Trisha Sims
Court Reporter
Notary Public