IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| POPPLE CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-2C |
| v. | ) | |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER
TO ASSERT AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Pursuant to Rules 1, 8(c), 13(e) and (f), and 15(a) and (d) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests leave of the Court to amend its answer to assert affirmative defenses and counterclaims based upon the False Claims Act, 31 U.S.C. § 3729 et seq., the anti-fraud provision of the Contract Disputes Act ("CDA"), 41 U.S.C. § 604, the Special Plea in Fraud, pursuant to 28 U.S.C. § 2514, and accord and satisfaction. This is the Government's first request for leave to amend its answer. Our proposed amended pleading is attached to this motion.

Defendant seeks leave to amend its answer to assert these affirmative defenses and counterclaims because discovery and our expert reports have demonstrated that the entire claim of Popple Construction, Inc. ("Popple") is tainted by fraud. Specifically, discovery and expert reports have established that: (1) certain elements of Popple's claim are contradicted by Popple's own records and the contract documents; (2) Popple submitted certain elements of its claim without any documentary support, but these claim elements are demonstrably untrue based upon other records; (3) Popple submitted a claim based upon a reading of the contract that is so implausible that the claim is fraudulent pursuant to controlling precedent. Popple submitted

these portions of the claim with an intentional or reckless disregard for the truth; and (4) Popple defrauded the United States Army Corps of Engineers ("Corps") by intentionally deceiving the Corps with respect to Popple salaries that should be included in the calculation of Popple's general and administrative overhead rate.

As remedies for Popple's fraud, the Government requests that the Court: (1) rule that Popple has forfeited all of its claims for the contract at issue pursuant to the Forfeiture of False Claims Act, 28 U.S.C. § 2514; (2) award the Government $904,319 pursuant to the anti-fraud provisions of the CDA, 41 U.S.C. § 604; and (3) award the Government a penalty of $5,500 to $11,000 and the costs of reviewing Popple's claims pursuant to the False Claims Act, 31 U.S.C. § 3729, as well as an additional penalty for 46 contract modifications that the Corps paid based upon a fraudulent overhead rate.

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUE

Whether leave to amend defendant's answer to assert an affirmative defense and counterclaims is appropriate under the circumstances of this case.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case involves a Corps contract to expand an existing levee system. In its complaint, Popple's principle allegation is that the Corps instructed Popple to expand the levee in six inch lifts rather than the eight inch lifts allowed in the contract. Popple seeks $904,319 in alleged additional costs for this item. Popple also seeks $64,636.84 because it alleges that it was required to furnish riprap in addition to the amount required by the contract.

## II. Statement Of The Facts

On December 29, 1997, the Corps issued the solicitation and construction specifications for the Wyoming Valley Levee Raising Project in Kingston-Edwardsville, Pennsylvania. The contract provided for the raising of approximately 17,000 linear feet of existing levee embankment in the Wyoming Valley, Kingston-Edwardsville, Pennsylvania. The Corps awarded the contract to Popple on March 17, 1998 in the amount of $7,782,643.00.

The solicitation contained 60 contract line item numbers ("CLINs"). The largest by far was CLIN 7AA, impervious fill, which provided for the placement of an estimated 253,100 cubic yards of impervious fill. The Corps estimated the amount of this CLIN at $4,378,630. Popple's bid price for this CLIN was $2,531,000. CLIN 7AB provided for the placement of an estimated 44,000 cubic yards of random fill. Popple priced this CLIN at $308,000. The difference between impervious and random fill is that the former required fine grained soils with a plasticity index (that is, a measure of the plasticity of the soil) of no less than three, while the latter allowed the use of coarse grained materials with no plasticity index minimum.

The contract provided for the contractor to raise the levees in layers (also referred to as "lifts") <u>up to</u> eight inches thick as follows:

> 8.2. IMPERVIOUS FILL AND RANDOM FILL: Impervious and random fill material shall be placed and spread in layers not more than 8 inches in uncompacted thickness, except that within 3 feet of structures, the uncompacted layer thickness shall be reduced to 4 inches. The maximum stones and rock fragments permitted in any lift shall not exceed 2/3 the uncompacted lift thickness measured by the greatest dimension.

With respect to the equipment used to compact the fill, the specifications contained the following requirement for the <u>impervious fill only</u>:

> 10.1.3. TAMPING ROLLERS: A non-vibratory sheepsfoot (tamping roller) shall be used to compact the impervious fill materials. The length of each tamping foot

> from the outside surface of the drum shall be of sufficient length to penetrate at least 75 percent of the uncompacted lift thickness, but not more than 110 percent of the uncompacted lift thickness.

Thus, based upon this provision, a contractor that wished to place the contract maximum of eight inch lifts would require equipment with tamping feet (also referred to as "pads") between six inches (75 percent of eight inches) and 8.8 inches (110 percent of eight inches). The specifications contained no representations, warranties, or predictions with respect to whether equipment suitable for constructing eight inch lifts would be available on the rental market several months later when the contractor would begin constructing lifts.

Mark Popple calculated Popple's bid and later certified Popple's claim. During Mr. Popple's deposition, there was a lengthy discussion as to Popple's planned method of constructing the project at bid time. Although his answers were somewhat evasive, Mr. Popple testified: (1) that Popple did not own equipment at bid time that could penetrate 75 percent of an eight inch lift; (2) Popple did not make any effort prior to bid to determine the rental market availability of such equipment; (3) Mr. Popple spent "not a lot" of time prior to bid thinking about the 75 percent penetration requirement and he may not have thought about it at all; and (4) Mr. Popple calculated Popple's bid based upon using a Hypac 852. The Hypac 852 has a pad length of four inches, which would have allowed Popple to construct lifts no more than 5.3 inches thick based upon the 75 percent penetration requirement contained in paragraph 10.1.3.

On May 14, 1998, Popple provided the Corps with a brochure of the compaction equipment it had selected, the Caterpillar 815B. According to the brochure, this piece of equipment has a pad length of 7.8 inches. Because this pad length is greater than 75 percent, but less than 110 percent, of eight inches, this equipment could be used to construct eight inch lifts.

In response, the Corps approved the sheepsfoot 815B for embankment widths of approximately 12 to 14 feet or greater.

On Friday, July 10, 1998, Popple informed the Corps that it was unable to obtain the Caterpillar 815B it had submitted. Popple stated that it was going to use another machine, the Caterpillar CP-563, from Monday, July 13, 1998 onward. The Corps approved Popple's use of the CP-563. The Corps stated that, based upon the equipment's indicated pad length of five inches and the specification's requirement for 75 percent penetration of the fill depth, Popple could use it to place uncompacted lift thicknesses of 6.6 inches or less. The Corps recommended that Popple place the impervious fill in uncompacted lifts 6 inches thick to ensure adequate penetration through each lift.

With respect to the random fill, on October 28, 1998, Popple submitted test strip results to the Corps. The results showed that Popple required 20 and 26 passes with the CP-563 to compact eight inch lifts of the random fill material. Popple also tried compacting six inch lifts of the material with another machine, the Hypac C850B. In response, the Corps asked Popple to provide the reason for reducing the 8-inch lift to 6 inches for the C850B compactor. Popple, in turn, responded by stating "[t]he number of passes needed to obtain the required compaction with an 8 inch lift was determined to be excessive for production."

Nearly five years later, on September 24, 2003, Popple submitted to the Corps a package it entitled "Just compensation for required placement of six inch impervious and random fills." Popple later certified this document as a claim. In the claim, Popple requested an additional payment from the Corps consisting of the following items:

| | | |
|---|---|---|
| 1. | Additional Costs of Placing Impervious Fill | $417,450 |
| 2. | Additional Costs of Placing Random Fill | $58,080 |
| 3. | Additional Costs of Rehandling Impervious Fill | $253,000 |

| | | | |
|---|---|---|---|
| 4. | Additional Costs of Testing Services | | $70,789.38 |
| 5. | Additional Popple Labor | | $105,000 |
| | | = | **$904,319** |

All elements of the claim were based upon Popple's assertion that a six inch lift is one-third more difficult to place than an eight inch lift.

Facts Relating To The Impervious And Random Fill Claims

Popple bid $10 per cubic yard for contract line item number ("CLIN") 7AA, impervious fill. In its claim, Popple alleges that its bid is based upon $2.50 per cubic yard ("pcy") to purchase the fill, $2.50 pcy to transport it, and $5.00 pcy to place it. Popple produced no documentation in response to Government discovery requests that confirms this breakdown of its bid price. Based upon approximately 253,000 cubic yards listed in the solicitation, Popple states that its as-bid impervious fill placement costs were 253,000 x $5.00 pcy = $1,265,000. Because it alleges that it had to construct the levee in six inch lifts rather than eight inch lifts, it contends that this required one-third more work because the number eight is one-third more than six (that is 6 x 1.33 = 8). Popple asserts that its as-built costs of placement were $1,265,000 x 1.33 = $1,682,450. The difference between this amount and the alleged as-bid amount ($1,682,450 - $1,265,000) equals the claim amount of $417,450.

In its claim, Popple makes nearly the identical damages calculation for the random fill as for the impervious, adjusting for a lower CLIN price and a lesser quantity. However, unlike the impervious fill, the contract did not require Popple to use a sheepsfoot roller with 75 percent penetration to compact the random fill. Therefore, this work could not have been affected by the unavailability of this equipment. In its complaint, Popple alleges that the Corps expressly directed Popple to construct the random fill in six inch lifts. Complaint, ¶ 17. However, in his deposition, Mark Popple denied this:

Q. So you're not contending there was a direction from the Corps to Popple to do the random fill areas in less than eight-inch lifts, correct?

A. I don't think there was.

Instead, Mr. Popple testified that it was necessary to construct the random fill in six inch lifts because of the location of the random fill in relation to the impervious fill. Because they were adjacent to each other, it was necessary to keep them uniform, according to Mr. Popple. Mr. Popple admitted that this would not have been the case for the entire project, even though the claim is based upon an increase of one-third for the total amount of the random fill. However, Popple made no effort in the claim or subsequent to Mr. Popple's deposition to remove random fill quantities that were not affected by the impervious fill.

Corps engineers have reviewed the drawings and found that much of the random fill was placed in areas isolated from the impervious fill because the random fill was beneath the impervious fill or entirely separate from the impervious. The Corps has found that at least 20,000 cy of the 44,000 cy of the random fill is isolated and not affected by the placement of impervious fill in six inch lifts.

Facts Relating To The Rehandling Of Impervious Fill

Popple alleges that constructing six inch lifts caused a backup of trucks which caused it to stockpile and rehandle fill. It alleges that it cost $4.00 per cubic yard to rehandle the fill. Id. Popple provided no documents in the claim, nor has it produced any documents in response to Government discovery requests, that support this amount. Popple alleges that it had to rehandle one quarter of the 253,000 cy of fill. Thus, it makes the following calculation:

253,000 cy x 0.25 = 63,250 cy x $4.00 = $253,000

With respect to how Popple calculated that it rehandled 25 percent of the material, Mr. Popple

testified "I really don't remember" and "It was an approximation."

Our expert witness, George Strickler, reviewed Popple's foreman's daily reports, contractor quality control reports, and a handwritten Popple log of truck loads and found that Popple had records which substantiate stockpiling approximately 16.2 percent of the fill. Simply making this adjustment to the claim reduces the claims as follows:

253,000 cy x 16.2% = 40,986 x $4.00 = $163,944.

Thus, if Popple had reviewed its own records, it would have seen that its rehandling claim was overstated by $89,056.

In addition, Mr. Strickler's review of Popple's records reveal that Popple stockpiled the overwhelming majority (95.5 percent) of the fill because of weather related reasons, a civic event at a nearby park, or other reasons unrelated to lift thickness, not because of a backup of trucks caused by lift thickness. With respect to this civic event, the Government compensated Popple for this stockpiling in contract modification no. 70. These records would have been available to Mr. Popple when he certified the claim.

Facts Relating To Additional Testing Services

Popple claims that its materials testing and surveying costs increased by one-third due to the alleged change from eight to six inch lifts. With respect to invoices from the testing firm (Midlantic Engineering), Popple's claim lists 43 invoices totaling $203,157.50. The claimed amount is $203,157.50 x 25 percent = $50,789.38, which again represents a one-third increase in planned testing. In discovery, Popple has produced only 13 of the 43 invoices. These invoices total $84,423 or about 42 percent of the amount allegedly paid. While this documentation is incomplete, it is the only element of this claim for which Popple has produced any documentary support of the alleged incurred costs.

The majority of the work Midlantic performed was work that would not have been affected by a change from eight to six inch lifts. Compaction testing was required for each lift, so that, if the Corps had directed a change from eight to six inch lifts, it would have caused an increase in work. However, other work (classification and moisture testing) was based upon cubic yards, for example, one test every 1,000 cy. Still, other work (concrete and aggregate testing) was entirely unrelated to the lifts. With respect to the invoices we received, only labor for the "field technician II" would have been affected by a change in lift thickness. The most Popple could properly claim was one-quarter of the field technician II amounts which, based upon the invoices we received in discovery, would total approximately $11,500.

With respect to the surveyor, Savakinas Surveying, Popple claims that it paid Savakinas $80,000, but has not produced a single Savakinas invoice in discovery. Popple again claims that it is entitled to one-quarter of this amount, $20,000, because of the alleged increase in effort caused by doing six inch lifts. Based upon this logic, Popple's as-bid amount for the surveying would have been $60,000. However, this is contradicted by Popple's pay estimate no. 1 which shows that Popple bid this work at $80,000. Therefore, there was no change in cost for the surveying.

In addition, like most of the testing, the surveying was not dependent upon lift thickness. Rather, the contract required Popple to do monthly surveys in support of its pay estimates. In some months, the Corps even allowed Popple not to do the surveys and bill by truckloads. In his deposition testimony, Mr. Popple agreed that, if Popple was not required to survey each lift, Popple would not be entitled to more money for the surveying:

Q. What about -- would surveying be more for six-inch lifts versus an eight-inch?

A. I don't know if we were required to survey each lift. If we were required to survey each lift, yes. If we weren't, I don't think so.

Popple was not required to survey each lift, but Popple has not removed the $20,000 for Savakinas Surveying from its claim.

Facts Relating To Additional Popple Labor

In this element of the claim, Popple seeks $40,000 in additional quality control ("QC") labor, $35,000 for a foreman, and $30,000 for a laborer. Each calculation is based upon the same allegation of a one-third increase in cost as the other claim elements. Popple alleges that it bid 3,000 hours for each of these workers and that total hours were 4,000. The calculations are based upon $40 per hour for the QC person, $35 per hour for the foreman, and $30 per hour for the laborer.

The Government has retained David Cotton, a certified public accountant and certified fraud examiner as an expert. Mr. Cotton reviewed the job cost records produced by Popple in discovery. Mr. Cotton found no support in Popple's records for a QC labor category (although some hours rates had a "CQL" reference designation), nor any support for a QC labor rate of $40 per hour.

With respect to the foreman, Mr. Cotton also reviewed the job cost records submitted by Popple. He found that the records support only 1,872.9 foreman's hours, less than half of the amount alleged.

Finally, as to the laborer, Mr. Cotton determined that the $30 per hour is overstated because the average labor rate paid by Popple was $20.63. Mr. Cotton noted that, even if Popple's claimed overhead rate of 24 percent, Popple's claimed profit of 8.65 percent, and one percent for bonding are added, the claimed hourly rate still does not reach $30 per hour.

Facts Relating To Both Popple's Additional Testing And Labor Claims

In addition, Popple's testing and labor claims duplicate, at least in part, the amount claimed in the impervious and random fill claims. In the measurement and payment section, the contract stated that payment for CLIN 7, which encompassed both the impervious and random fill CLINs, would:

> constitute full compensation for furnishing all embankment materials, equipment, and labor, and for performing all work necessary to prepare the foundation of the embankment, construction of test strips, testing, and to transport, process, screen, spread, aerate, sprinkle, disc, compact, or any other incidental work required to construct the applicable zones of the embankment ...

(Emphasis added). Thus, both the testing services and labor should have been included within this CLIN. Payment of the one-third increase for impervious and random fill placement that Popple seeks should fully compensate Popple for the alleged one-third increase in work. Its separate claims for these issues is double billing, unless Popple included these amounts elsewhere in its bid.

At his deposition, Mark Popple testified that he may have included the testing and labor costs in the CLIN for miscellaneous work. This would be the only other place for him to have bid the testing and labor because the other CLINs are specific in the types of work to be provided for that CLIN.

The contract states that payment under the miscellaneous CLIN included payment for "constructing access ramp gates, pavement markings, protective fencing and replacement of existing guide rail not included in other payment items ..." Popple bid the miscellaneous CLIN at $460,726.

Popple's claim alleges that the as-bid amount for the testing services and labor contained in this part of the claim was $527,368. This amount is greater than the $460,726 it bid for the

miscellaneous CLIN, and would leave no money for construction of the access ramp gates and other items identified in that CLIN. Therefore, it is not possible for Popple to have included all of these items in the miscellaneous CLIN.

When Popple first submitted this claim as a request for an equitable adjustment, prior to claim certification, the Corps identified this double billing problem for Popple. In a letter to Popple, the Corps stated that these costs "are contained in the contractor's claimed amounts for [random and impervious] fill. The contractor makes no effort to exclude these costs and therefore appears to ask for payment for them twice. For the contractor to ask for the costs twice under two different names leaves the contractor open for fraud investigation if this claim is ever certified." Despite this warning, Popple did not remove any of these items from the claim when it certified the claim.

FACTS RELEVANT TO THE RIPRAP CLAIM

Popple's claim for additional riprap includes about $3,500 for overhead based upon a previously agreed upon overhead rate of 24 percent. While the Corps agreed to this rate, we have obtained evidence through discovery that demonstrates that Popple made false representations to the Corps that the Corps relied upon in agreeing to this rate.

Approximately 14 months after contract award, in May, 1998, while several issues were pending, Popple requested that the Corps agree to an overhead rate of 31 percent. This rate was extraordinarily high. The Corps asked for backup documentation, including a breakdown of officer's salaries. Popple provided this information, which listed salaries for two Popple brothers, Mark and Jeffrey. The Corps calculated the correct rate to be 17.61 percent.

The Corps thereafter met with Mark Popple and Popple's certified public accountant on August 4, 1999. After the Corps explained to them why it had reduced the rate, Mr. Popple

responded by identifying employees that he had "forgotten" to identify previously, whose salaries he alleged should be included in the overhead rate. Included among the previously unidentified people was another Popple brother, David Popple. As a result of Mr. Popple's representations, the Corps agreed to a 24 percent overhead rate. These events are recorded in the Corps' August 11, 1999, price negotiation memorandum.

Through discovery we obtained Popple's financial statements. Our expert, Mr. Cotton, was able to ascertain that David Popple's salary was not included in these financial statements. When asked at his deposition about his brother's status, Mark Popple's testified as follows:

Q. What [is] Dave Popple's position with respect to Popple Construction?

A. He's an owner. That's it. He has no daily functions in the operations of it.

* * *

Q. So why are Dave Popple's salary costs not included in Popple's financial statements?

A. Because he runs the quarry operations.

If David Popple's salary had not been included in the overhead calculation, Popple's overhead rate would have been reduced by two percent. The Corps subsequently paid 46 contract modifications based upon this inflated overhead rate. The minor difference in the overhead rate would decrease Popple's riprap claim by $667.90.

ARGUMENT

The facts set forth above give rise to claims pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., the CDA, 41 U.S.C. § 604, and a Special Plea in Fraud pursuant to 28 U.S.C. § 2514. Because our claim arises out of the same transaction upon which Popple's claim is based - the contract to construct the levees - our claims must be asserted as compulsory counterclaims

pursuant to RCFC 13(a). The Court of Federal Claims possesses jurisdiction pursuant to 28 U.S.C. §§ 1503 and 2508 to adjudicate counterclaims raised by the United States, including those arising pursuant to section 5 of the CDA, the FCA, and the Special Plea in Fraud under 28 U.S.C. § 2514. Martin J. Simko Constr., Inc. v. United States, 852 F.2d 540, 542-48 (Fed. Cir. 1988); Brown v. United States, 524 F.2d 693, 703 (Ct. Cl. 1975).

I. Anti-Fraud Section Of The CDA And False Claims Act

The anti-fraud section of the CDA, 41 U.S.C. § 604, provides, in pertinent part:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

Pursuant to the anti-fraud section of the CDA, the Government will be able to recover the total amount of any fraudulent claims submitted regardless of whether payment was made, in addition to the costs incurred in investigating the false claims. Although the CDA does not prescribe a standard of proof, the Federal Circuit applies the preponderance of the evidence standard. UMC Electronics, Co. v. United States, 249 F.3d 1337, 1338 (Fed. Cir. 2001).

The False Claims Act ("FCA"), as amended in 1999, provides civil penalties for each false claim submitted to the government, regardless of whether payment was made. The penalty amounts were increased from $5,000 to $10,000 to $5,500 to $11,000 pursuant to the Federal Civil Penalties Inflation Act of 1996, Pub. L. No. 104-410, as amended by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134. See also 28 CFR § 85.3(a)(9). The False Claims Act, 31 U.S.C. § 3729(a), requires that we prove the following:

> 1. the defendant knowingly present[ed] . . . a false or fraudulent claim for approval; or

> 2. the defendant knowingly [made] or [used] . . . a false record or statement to get a false or fraudulent claim paid or approved . .

31 U.S.C. § 3729 et seq., as amended by Debt Collection and Improvement Act of 1996, Pub. L. No. 104-134, Title 3, Ch. 10, Section 31001(s), April 26, 1996, 110 Stat. 1321-358 (effective September 29, 1999 for violations occurring after that date).

Pursuant to the FCA, "knowing" or "knowingly" means that a person (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). The statute expressly provides that the government need not prove specific intent to defraud. Pursuant to the False Claims Act, proof by a preponderance of the evidence is sufficient for the government to prevail. 31 U.S.C. §§ 3729, 3731.

Pursuant to the CDA and FCA, Popple's claim is fraudulent because it submitted the claim in reckless disregard for the truth. Other than a fraction of the Midlantic invoices, the claim has no factual support because Popple failed to preserve and/or produce key records. In several instances the claim is contradicted by the records that Popple did produce. Popple's claim is based upon estimates, even though at least some records were available to Popple. When asked at his deposition why he never recalculated the claim using actual quantities and amounts, Mr. Popple testified that "to calculate everything, you would have to have an accountant out in the field, micromanaging and breaking every little feat out for different phases of the work." This is untrue because contractors appear in this Court on a regular basis with claims based upon actual quantities and amounts. If Mr. Popple had reviewed documents such as the contract, his foreman's daily reports, invoices from subcontractors, and Popple's labor records, he would have known that the claim was overstated and lacking support. In one case,

the Corps specifically warned Popple that, if it submitted a certified claim, it would be fraudulent, but Popple certified the claim anyway.

The overarching problem with Popple's claim and complaint is its assertion that the Corps required Popple to change its bid plan and construct the project in six inch, rather than eight inch, lifts. This is belied by Mr. Popple's deposition testimony in which he admitted that he bid the contract based upon a plan to use the Hypac 852, which would have allowed Popple to construct the project in lifts no thicker than 5.3 inches. Taking this fact into account, Popple's claim is simply an attempt to shift to the Corps Popple's errors in: failing to carefully read the specifications in preparing its bid; failing to ensure it could secure proper equipment; and basing its bid upon a piece of equipment that could not be used to construct eight inch lifts.

A second fundamental problem with the claim is that the Corps made no warranties or predictions in the contract with respect to what equipment would be available on the rental market several months after issuance of the solicitation and construction specifications. No reasonable contractor could read the contract as making any warranties or representations with respect to equipment availability. Yet, this is the basis of Popple's claim. Any reasonable contractor would have known that it was the contractor's responsibility to secure equipment. See Penguin Industries, Inc. v. United States, 530 F.2d 934, 937 (Ct. Cl. 1976) ("the contractor must assume responsibility for the means and methods selected to achieve the end result."). Because Popple's claim has no reasonable basis in the contract, the Court should hold Popple liable pursuant to the CDA and FCA. See Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1366 (Fed. Cir. 1998) (contractor liable pursuant to the CDA and FCA when its claim was based upon such an implausible construction of the contract that it bordered on the frivolous).

## II. Special Plea In Fraud

Section 2514 of title 28, United States Code, provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
>
> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

The Federal Circuit has held that, to prevail pursuant to this statute, the government must prove by clear and convincing evidence that the "claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994) (citing McCarthy v. United States, 670 F.2d 996, 1004 (Ct. Cl. 1982)). The penalty pursuant to this statute is forfeiture of all of the contractor's claims arising under the contract. Long Island Savings Bank, FSB, v. United States, 476 F.3d 917 (Fed. Cir. 2007).

Here, Mark Popple misrepresented the role of his brother David in negotiations with the Corps to gain a higher overhead rate which would be paid to Popple on modifications. His deposition testimony, in which he concedes that David's salary is not included in Popple's financial statements because he runs a quarry operation, is sufficient to prove a fraudulent intent. Long Island, 476 F.3d at 931 ("The fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent."). Although Popple's fraud here is of a relatively small amount ($667.90), this is of no moment with respect to the forfeiture of Popple's entire claim. See, e.g., Supermex, Inc. v. United States, 35 Fed. Cl. 29, 43 (1994) ($1.1 million claim forfeited as a result of fraud

totaling, at most, $3,000).

III. The Court Should Grant The Government Leave To Amend

In order to assert an affirmative defense of accord and satisfaction and affirmative defenses and a counterclaim pursuant to the anti-fraud provision of the CDA, the special plea in fraud statute, and the False Claims Act, the Government must amend its answer. RCFC 13(e) and (f). An amendment is permitted pursuant to RCFC 15(a), which provides that a party may amend its own pleading more than 20 days after it was served only by leave of the court or by written consent of the adverse party and that "leave shall be freely given when justice so requires." RCFC 15(a); accord First Nationwide Bank v. United States, 48 Fed. Cl. 248, 254 (2000). The determination of whether to grant a motion for leave to amend a pleading is within the discretion of the Court, but outright refusal to grant leave without any reason to justify the denial is not an exercise of discretion. Foman v. Davis, 371 U.S. 178, 182 (1962). Applying this test, this Court should "deny a motion to amend . . . only for substantial and legally sufficient reasons." St. Paul Fire & Marine Ins. Co. v United States, 24 Cl. Ct. 518, 520 (1991).

Discovery in this case concluded on May 25, 2007. It was only through our review of the documents produced in discovery, our depositions of Popple’s witnesses, and review of our expert reports were we able to identify the fraud committed by Popple in this case. At Mr. Popple’s deposition on April 5, he made key admissions. Any reasonable contractor with knowledge of the admitted facts never would have certified the claim if it wished to avoid a fraud counterclaim, and would have withdrawn the claim after the deposition. For example, Mr. Popple admitted in his deposition that he bid the project with the intent to use a piece of equipment that would have allowed Popple to construct lifts no thicker than 5.3 inches. Yet, Popple has done nothing to withdraw a claim that contends it planned to construct the levee in

eight inch lifts.

Accordingly, pursuant to the facts of this case, the Government should be permitted to amend its answer to assert an affirmative defense of accord and satisfaction and counterclaims pursuant to the Anti-fraud provision of the CDA, the False Claims Act, and the Special Pleas In Fraud Statute.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 353-1618
(202) 514-8624 (fax)

August 29, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 29th day of August, 2007, a copy of the foregoing motion for enlargement was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell